# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

Civil Action No. **1:25-cv-00451-MR**

**JERRY ANDERS, d/b/a ANDERS MANGA,**

Plaintiff,

v.

**STABILITY AI US SERVICES CORPORATION; and NAVARR ENTERPRISES, INC., d/b/a AUDIOSPARX,**

Defendants.

FILED
ASHEVILLE, NC

FEB 2 3 2026

U.S. DISTRICT COURT
W. DISTRICT OF N.C.

# OPPOSITION TO DEFENDANT NAVARR ENTERPRISES, INC.'S MOTION TO DISMISS

## INTRODUCTION

Navarr's Motion to Dismiss should be denied because Navarr has not shown that the 2015 Agreement clearly and unambiguously authorized it to license Plaintiff's copyrighted sound recordings for use as data for generative AI training. The contract's catch-all must be read in light of the enumerated human-listening end uses, uses in which recordings are delivered, performed, or synchronized for human consumption, not copying for training data where the music is not heard by humans. The Agreement also does not mention AI, datasets, or model training, and it contains no

1

"now known or hereafter devised" clause extending the license to future technologies. (Ex. 4 at 1-2.)

Further, AudioSparx's own opt-in/opt-out framework and "AI Royalties" reporting make Plaintiff's claim plausible. (Exs. 5, 17, 21.) AudioSparx's own materials undercut any "blanket authorization" theory. AudioSparx states that "Only the audio content from AudioSparx artists who have opted in to this deal will be provided to the various client companies we license content to, such as, for example, to Stability AI for model training for its Stable Audio generative AI product." (Ex. 5.) AudioSparx also represented widely in interviews and press releases that artists could "opt in or out of the Stability AI deal at any time at their own volition," yet denied Plaintiff's removal and AI objection requests as "our prerogative." (Exs. 7, 20 page 2 "Revolutionary Revenue Sharing".) Those facts, taken as true at this stage, defeat dismissal.

The Court also has specific personal jurisdiction because Navarr chose to create and administer an ongoing artist relationship with Plaintiff, a North Carolina resident, over many years, including repeated royalty accounting and other administration sent to Plaintiff in North Carolina, with Plaintiff's North Carolina address maintained in Navarr's own records. We

2

have also identified at least 39 other NC artists on AudioSparx. (Exs. 33-34, 38.) Venue is proper. (28 U.S.C. § 1400(a).)

This is a federal statutory copyright lawsuit, not a contract dispute. The presence of a contract does not convert a Copyright Act, 17 U.S.C. § 501 claim into a contract claim or defeat proper venue.

Navarr was properly served at its then-listed registered agent address on Sunbiz (the official Florida Department of State, Division of Corporations website), and Navarr changed that address only after service was complete. (Exs. 26-27; see also Ex. 29.)

## I. Service of Process Was Sufficient (Rule 12(b)(5))

### A. Plaintiff served Navarr at its then-listed registered agent address.

Navarr claims Plaintiff attempted "substitute service" at a private mailbox. This is incorrect. Plaintiff served Navarr at the exact registered agent address listed on Sunbiz, Florida's official corporate record, at the time service was completed. This was service at Navarr's publicly designated registered agent address, not improper "substitute service" under the private-mailbox rule. Even if the location also functions as a mail-receiving business, it remained Navarr's listed registered agent

3

address for service at the time, and Plaintiff was entitled to serve Navarr there. (Ex. 26.)

**B. Navarr changed its registered agent address only after service was complete.**

Plaintiff's licensed process server from ABC Legal first attempted service seven times over ten days at the residential address 140 Frontera Dr., but the property was gated and inaccessible. During those attempts, individuals speaking from behind the closed gate and/or intercom stated that Ms. Zumpano resided there but was unavailable (e.g., "traveling and won't be back for several weeks" and "she is asleep"). (Ex. 27.)

On January 27, 2026, service was completed at 2800 N 6th Street, St. Augustine, FL at Navarr's then-listed registered agent address. (Ex. 27.) Sunbiz listed that same location as Navarr's registered agent address at the time. (Ex. 26.) Navarr's own exhibit confirms this timing: its 2025 Sunbiz Annual Report lists 2800 N 6th Street as the registered agent address. (Zumpano Decl., Ex. B at 3.) Navarr did not change its registered agent address to 140 Frontera Dr. until February 5, 2026 - nine days after service. (Ex. 29.) Plaintiff is entitled to rely on the address a corporation holds out to the State and the public as its registered agent address for service.

4

Navarr's own AudioSparx "Contact Us" page likewise listed 2800 N 6th St. as its corporate address. (Ex. 30.)

**C. Florida law requires the registered office to be service-ready.**

Under Fla. Stat. § 48.091(3), a corporation must keep its registered office open and available for service during regular business hours. Where the registered agent is not present at the registered office, Florida law permits service to be accepted there by an employee present at that location. Fla. Stat. § 48.091(4)(b). Here, the process server delivered the summons and complaint at Navarr's listed registered agent address, and Ms. Kelly accepted service there on Navarr's behalf. (Exs. 26-27.) Even if the registered agent failed to forward the papers internally, Florida law provides that this does not invalidate service. Fla. Stat. § 48.091(5). Having designated 2800 N 6th Street as its registered agent address for service, Navarr cannot avoid service by choosing a commercial mail-receiving service.

**D. Alternatively, any defect should be cured, not dismissed.**

At minimum, if the Court finds any defect, Plaintiff should be allowed a short period to cure service rather than dismissal. Re-serving would be a challenge since Navarr has now changed their Registered Agent address

5

to their heavily gated home where before, the registered agent would not come out and accept service as described above and by ABC Legal. (Ex. 27)

The First Amended Complaint did not change anything as to Navarr. It only corrected the name of the Stability AI co-defendant. Now that Navarr has counsel on the docket, Plaintiff has served the First Amended Complaint on counsel directly (by email and mail), so dismissal is not warranted.

## II. The Court Has Specific Personal Jurisdiction Over Navarr (Rule 12(b)(2))

North Carolina's long-arm statute reaches to the limits of due process. Navarr argues Plaintiff did not identify a specific long-arm provision. Plaintiff does so here: this case fits N.C. Gen. Stat. § 1-75.4(4)(a) because Plaintiff's claims arise from conduct outside North Carolina that caused injury to a North Carolina resident, and at the time of the injury Navarr was carrying on solicitation and services directed into North Carolina through an ongoing vendor relationship with Plaintiff.

Navarr tries to frame this as "internet only," "plaintiff's unilateral activity," and "no meaningful North Carolina contacts." The record shows

6

the opposite. This is not a passive-website case. Navarr deliberately created and maintained mandatory, perpetual artist relationships, repeatedly administered those relationships into North Carolina, and directly solicited Plaintiff by name to expand the relationship. Plaintiff is not an isolated North Carolina contact. AudioSparx's own website identifies at least 39 North Carolina-based artists on the platform also under mandatory perpetual contracts. (Ex. 38.)

## A. Purposeful availment: Navarr deliberately created and administered a continuing relationship with a known North Carolina resident.

1. AudioSparx did not passively host Plaintiff's uploads; it required an application, approval process and affirmatively approved Plaintiff as an artist/vendor, stating it was "excited" Plaintiff had chosen AudioSparx "to represent" him. (Ex. 39.) This supports that this was a deliberate, ongoing relationship they chose to enter, not just Plaintiff's unilateral uploading.

Navarr wants the story to be: Plaintiff chose to upload music to a website, so any North Carolina contact was unilateral. Exhibit 6 shows the opposite. In 2023, Plaintiff tried to withdraw and remove his music. AudioSparx reviewed his account and refused, telling him

7

he was "committed to a perpetual irrevocable license" and that "termination is not an option," That is Navarr acting, asserting continuing control over an ongoing relationship with a North Carolina artist, not Plaintiff's unilateral activity. (Ex. 6.)

Navarr kept Plaintiff's North Carolina address in its own vendor records and repeatedly sent recurring commission statements and administered the relationship to Plaintiff in North Carolina. Navarr's own quarterly commission statements list Plaintiff's North Carolina address under "YOUR CONTACT INFO" and instruct Plaintiff to review and correct it if needed. That is not Plaintiff's allegation, it is Navarr's own recordkeeping. It also shows repeated, ongoing administration into North Carolina: quarterly commission statements are part of the relationship Navarr chose to maintain with Plaintiff in this forum. (Exs. 33-34.)

This directly answers Navarr's "we did not reach into North Carolina / everything was internet" argument. Navarr knowingly maintained Plaintiff as a North Carolina artist and repeatedly performed the administrative side of the relationship into North Carolina. (Exs. 33-34.)

8

2. AudioSparx requires a perpetual artist commitment for every track, creating mandatory, long-term relationships by design. AudioSparx states plainly that to participate as a vendor, an artist must make a "perpetual" license commitment "for each and every track you upload." (Ex. 35.) AudioSparx explains the purpose is to provide a "stable shopping experience for clients" (Ex. 4 at 2, "Term") so tracks do not "suddenly and unexpectedly disappear" while TV/film/ad agencies "are considering  licensing for a big ad campaign or TV/Film production". This is not a casual marketplace. It is a business model built on perpetual term contracts. (Ex. 35)

Navarr's own "perpetual commitment required" policy undercuts its attempt to frame AudioSparx as merely an "internet-accessible" platform or "interactive" website and to characterize Plaintiff's North Carolina contacts as unilateral.

3. Navarr directly solicited Plaintiff by name and tried to expand rights beyond a basic upload relationship. In 2015, AudioSparx repeatedly reached out to Plaintiff personally ("Hi Anders"), and urged Plaintiff to assign AudioSparx "Publishing Administration," pointing Plaintiff to the publishing administration agreement page. They also urged

9

Plaintiff to participate in their claimed "perpetual Music Cult license with Viacom," (Exs. 31, 37.) This is active solicitation and relationship-building, not passive hosting. It also rebuts Navarr's claim that Plaintiff simply "located AudioSparx" and everything thereafter was unilateral.

4. Plaintiff is not an isolated North Carolina contact. AudioSparx's own website identifies at least 39 North Carolina-based artists on the platform, demonstrating that Navarr repeatedly forms and maintains perpetual artist relationships with other North Carolina residents, not just Plaintiff. (Ex. 38.)

These contacts are not random: Plaintiff's claims arise from this continuing vendor relationship and Navarr's licensing/monetization of Plaintiff's tracks through that relationship.

## B. "Arise out of or relate to": Plaintiff's claims relate to the same ongoing relationship Navarr administered into North Carolina.

Navarr argues the alleged infringement did not occur in North Carolina and cites *Walden* and cases emphasizing where the challenged conduct occurred. But specific jurisdiction does not require that every act

10

occur in the forum; it requires that the suit-related conduct creates a substantial connection with the forum and that the claims "arise out of or relate to" the defendant's forum-directed activities. Ford Motor Co. v. Montana Eighth Judicial Dist. Court, 592 U.S. 351, 359–62 (2021).

Here, Plaintiff's claims relate to the same ongoing artist relationship Navarr administered into North Carolina. Through that relationship, Navarr obtained Plaintiff's tracks, licensed/sublicensed them, and monetized them, including by reporting AI-related licensing activity for Plaintiff's tracks as "AI Royalties." (Ex. 21; Exs. 33-34.) Navarr cannot separate the alleged infringement from the very relationship through which it sourced Plaintiff's works and then accounted for the AI-related activity tied to those works. (Ex. 21; see also Ex. 17.)

Also, Navarr's "no AI revenue from North Carolina" point is a distraction. The jurisdictional question is not whether Stability paid Navarr from a North Carolina entity. The question is whether Navarr deliberately did business with a North Carolina rights-holder and repeatedly administered that relationship into North Carolina. (Exs. 33-35.)

**C. Fairness and reasonableness.**

11

It is fair and constitutionally reasonable to litigate here because Navarr knowingly maintained a mandatory perpetual contract relationship with a North Carolina vendor for years, kept Plaintiff's North Carolina address in its own system, and repeatedly administered that relationship into North Carolina through quarterly commission statements and related account administration. (Exs. 33-34, 35.) Navarr cannot repeatedly engage a North Carolina rights-holder and then argue that litigating in North Carolina is unfair or unforeseeable when the dispute arises from that relationship.

This case involves a single alleged licensing/sublicensing chain and overlapping facts. Splitting it into two separate cases in different states would force a pro se Plaintiff to litigate the same dispute against two defendants in separate forums at the same time, creating unnecessary expense, duplicating discovery, and could lead to inconsistent rulings.

**D. Alternatively: jurisdictional discovery; and if needed, severance and transfer rather than dismissal.**

If the Court concludes the record is not yet sufficient on personal jurisdiction, Plaintiff respectfully requests limited jurisdictional discovery tailored to facts uniquely in Navarr's possession, including:

12

1. The number of North Carolina-based artists under contract and the periods of those relationships;

2. Documents sufficient to show how Navarr administers artist accounts for North Carolina residents/artists (statements, payments, address records, tax reporting);

3. Communications and records sufficient to show how Navarr treated artist catalogs for AI licensing and how AI licensing activity was accounted for and distributed to artists;

4. Documents sufficient to show how Navarr processed opt-out and removal requests from North Carolina–based artists (including request logs, internal tickets/notes, and responses);

In the further alternative, because this action involves a single alleged licensing/sublicensing chain with a co-defendant, if the Court finds personal jurisdiction lacking as to Navarr, Plaintiff requests severance under Rule 21 and transfer of the claims against Navarr to an appropriate federal district court in Florida under 28 U.S.C. § 1631 and/or § 1406(a), in the interest of justice, rather than dismissal.

13

### III. Venue is Proper (Rule 12(b)(3))

In a copyright action, venue is proper in any district where the defendant "may be found," meaning any district where the defendant is subject to personal jurisdiction. Because Navarr is subject to specific personal jurisdiction in this District, the venue is proper under 28 U.S.C. § 1400(a).

Alternatively, venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims were directed into this District through Navarr's mandatory, perpetual license relationship with Plaintiff in North Carolina and resulting recurring commission statements, account administration, and related reporting reflecting exploitation of the works at issue, including AI-related accounting. (Exs. 17, 21, 33-34.)

This is a federal statutory copyright lawsuit, not a contract dispute. The presence of a contract does not convert a Copyright Act, 17 U.S.C. § 501 claim into a contract claim or defeat proper venue.

Navarr's highlighted "General" clause does not warrant dismissal. The one-year limitation applies to any "cause of action … with respect to this agreement" (contract claims), not Plaintiff's federal Copyright Act claim. The Florida "specific jurisdiction" language is, at most, a forum-selection

14

provision; it does not eliminate this Court's authority to exercise personal jurisdiction where due process is satisfied. In any event, even if the Court were to enforce that provision, the proper remedy would be transfer, not dismissal.

## IV. Failure to State a Claim (Rule 12(b)(6))

At the motion-to-dismiss stage, the Court must accept Plaintiff's factual allegations as true and draw all reasonable inferences in Plaintiff's favor.

A license is an affirmative defense, and dismissal on that basis is appropriate only if the defense is clear on the face of the pleadings and any properly considered documents. See, e.g., *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc). At minimum, the 2015 Agreement does not unambiguously authorize the challenged AI training, so the issue cannot be resolved on a Rule 12(b)(6) motion.

Navarr's Rule 12(b)(6) argument is narrow: it claims Plaintiff's infringement claim fails because the 2015 AudioSparx Vendor Licensing Agreement unambiguously authorized copying Plaintiff's sound recordings for use as training data in generative AI models under the phrase "all types of commercial and consumer uses." That is not a basis for dismissal here.

15

**Plaintiff's allegations establish lack of authorization on three independent grounds:**

1. The 2015 Agreement contains no grant of rights for AI training. (Ex. 4. Page 1, Grant of Rights)

2. AudioSparx's own framework required affirmative artist opt-in as a condition precedent to providing works for AI training, a condition Plaintiff did not satisfy. (Ex. 5.)

3. AudioSparx publicly represented artists could opt out at any time "at their own volition", yet Defendants denied Plaintiff's removal and objection requests. (Exs. 6-7, 20 page 2 "Revolutionary Revenue Sharing: A Promise to Artists".)

Any one of these grounds defeats dismissal.

Defendant relies on the phrase "all types of commercial and consumer uses" as if it were unlimited. But general language must be read in context. The Agreement authorizes AudioSparx to "represent, market, sub-license, and distribute" the works for "all types of commercial and consumer uses," and then lists examples centered on traditional music-library uses such as TV, film, commercials, games, multimedia,

16

downloads, streaming, and public performance. (Ex. 4 at 1.) Those are human-consumptive, listening end uses, not copying complete recordings for use as training data in generative AI models.

The listed "duplication" and other rights are secondary, operational rights that facilitate the enumerated end uses in the Grant of Rights; they are not independent grants authorizing unrelated uses such as generative AI training. (Ex. 4 at 1.)

Under the canon of *ejusdem generis*, the catch-all phrase "all types of commercial and consumer uses" must be read in light of, and limited by, those enumerated human-listening end uses. Generative AI training is a fundamentally different activity: it is a non-human facing, machine-learning process in which recordings are copied and ingested solely so that machines can analyze features such as melody, harmony, rhythm, timbre, and tempo. The Agreement's broad language cannot be stretched to cover this different kind of use. At minimum, the Agreement is ambiguous on this point, and that ambiguity defeats dismissal at the pleading stage. See Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 516 (4th Cir. 2002); Yates v. United States, 574 U.S. 528, 545 (2015). Any ambiguity in

17

the scope of the license must be construed against the drafter (*contra proferentem*).

Defendants lean heavily on the Agreement's phrase "all types of commercial and consumer uses." But AudioSparx's own pricing FAQ shows what "commercial use" meant in practice: a client licensing a track for a production people watch or listen to, with "variant" pricing based on the end client's intended use (e.g., a worldwide motion picture versus a small, local use like a dance class). Even AudioSparx's broad "buyout" examples are described in traditional media terms, film, trailers, DVDs, websites, not AI machine training. (Ex. 15 page 2.)

The Agreement does not mention AI or related terms, and it contains no "now known or hereafter devised" language expanding the license to entirely new technical uses. (Ex. 4 at 1-2.) Courts have held that silence does not automatically grant rights in later-developed technologies. See Random House, Inc. v. Rosetta Books LLC, 283 F.3d 490, 492–93 (2d Cir. 2002). As in Random House, where a license to publish "in book form" did not automatically include e-book rights, the 2015 Agreement here cannot be stretched to cover a fundamentally different category of use: internal

18

copying into training data so a machine-learning system can learn patterns and generate output.

Furthermore, the agreement explains that the "perpetual" nature of the contract is to ensure a "stable shopping experience" so clients can return to license a track they previously heard, a justification that applies to human listening, not machine ingestion. AI training isn't a "shopping experience" for music. Perpetual and irrevocable describes how long authorized uses may continue; it does not expand the scope of what uses are authorized. (Ex. 4, Page 2 "Term" section)

Finally, the grossly disproportionate compensation further demonstrates that generative AI training was not a contemplated use under the 2015 Agreement. AudioSparx's own published FAQ pricing guidance states that license fees for high-end commercial uses exceed $1,000 per track. (Ex. 15, page 3 "Stay Competitive With Pricing") Plaintiff previously licensed one of his sound recordings for a Warner Bros. nationally broadcast television series for approximately $10,000 in upfront fees. (Ex. 18.) Yet for the enterprise-scale use of Plaintiff's entire catalog in generative AI model training, Navarr compensated Plaintiff at only approximately $0.19 per track. (Ex. 17.) This stark disparity confirms that AI

19

training constitutes a distinct, high-volume commercial exploitation far beyond the traditional music-library uses the parties contemplated in 2015.

## B. Defendants' own conduct treats AI training as a separate category.

Defendant's later conduct further undermines their claim that AI training was plainly covered by the 2015 Agreement. AudioSparx created a page titled "License Music or Sound Effects for AI Training and Machine Learning Projects," to market to AI companies and lists uses not enumerated among the traditional production-music end uses listed in the 2015 Grant of Rights. (Ex. 16.) The page characterizes this AI licensing as a new technological development: "With the explosion of new technological possibilities created by the advent of transformer-based AI technology, the music industry is undergoing a significant renaissance period of new development, and we're at the forefront of this evolution!" (Ex. 16. Page 2, last sentence) This supports Plaintiff's allegation that AI training is treated as a distinct category of use, not an ordinary continuation of the 2015 production-music license, and it further shows the 2015 Agreement is not unambiguous as to AI training.

## C. Defendants' opt-in/opt-out framework independently defeats any "blanket authorization" theory.

20

Even if the Court were to conclude the 2015 Agreement for human-listening and playback use is broad enough to cover non-human listening machine learning, Defendants' own opt-in/opt-out framework independently supports two alternative paths for lack of authorization, defeating dismissal;

1. **Opt-In as a Condition Precedent**. AudioSparx's Knowledge Base expressly states: "Only the audio content from AudioSparx artists who have opted in to this deal will be provided to the various client companies we license content to, such as, for example, to Stability AI for model training for its Stable Audio generative AI product." It further confirms the content is licensed "for the sole purpose" of training generative AI models. (Ex. 5.)

AudioSparx cannot simultaneously tell artists that "only opted-in" content will be provided for AI training and argue that a 2015 contract automatically authorized training for Plaintiff by default.

In April 2023, Plaintiff requested removal of his music from the AudioSparx platform after roughly eight years of zero sales revenue through AudioSparx.com. AudioSparx denied that request. This was approximately five months before Stability AI publicly launched Stable Audio in September 2023. AudioSparx was therefore on notice that Plaintiff

21

no longer wished to continue the relationship, trying to opt-out of Audiosparx all together and certainly had not affirmatively opted in to any new generative-AI licensing program. (Ex. 6.) Taken as true, these allegations plausibly establish the absence of affirmative consent under Defendants' own opt-in framework.

2. **Opt-Out Representations vs. Denials**. AudioSparx publicly represented; "For the artists participating at AudioSparx, they can opt in or out of the Stability AI deal at any time at their own volition." (Ex. 20 page 2.) Stability AI publicly represented that "All of AudioSparx's artists were given the option to 'opt out' of the Stable Audio model training" (Ex. 8 page 2 "Safeguards") and that it was "honoring opt-out requests." (Ex. 8. Page 1, "Key Takeaways", bullet 3)

In August 2024, after Plaintiff learned that Stable Audio had been trained using his works, Plaintiff again requested removal and expressly objected to AI training. AudioSparx again refused, stating that refusal was "our prerogative." (Ex. 7.) These denials, taken as true, plausibly establish the absence of consent under Defendants' own opt-out framework.

**AudioSparx's Own Sales Records Reflect AI-Training Licensing Activity Tied to Plaintiff's Works.** AudioSparx's Artist Sales Report

22

contains a distinct "AI Royalties — From GenAI/ML Licensing Activity" category and reflects "Tracks Compensated: 240." (Ex. 17, 21.) This supports Plaintiff's allegations that AudioSparx licensed and monetized Plaintiff's works in connection with AI licensing activity despite Plaintiff's lack of authorization.

Plaintiff has alleged, and supported with Copyright Office registrations, ownership and unauthorized copying for generative AI training. (Exs. 1–3; Ex. 21.) Navarr has not shown that the 2015 Agreement unambiguously authorizes AI training as a matter of law, and Navarr's own opt-in/opt-out framework and repeated denials of Plaintiff's removal and objection requests independently defeat any "blanket authorization" theory. Accordingly, Navarr's Motion to Dismiss should be denied as to Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, Defendant Navarr's Motion to Dismiss should be denied in its entirety. In the alternative, if the Court concludes it lacks personal jurisdiction over Navarr, Plaintiff respectfully requests (1) limited jurisdictional discovery, or (2) severance and transfer of the claims against Navarr to an appropriate federal district in Florida pursuant to 28

23

U.S.C. §§ 1406(a) and/or 1631, in the interest of justice and to avoid unnecessary refiling and expense for a pro se plaintiff. If transfer is not granted, Plaintiff respectfully requests dismissal without prejudice.

Respectfully submitted,

Jerry Anders
Jerry Anders d/b/a Anders Manga
132 Stoneridge Lane
Pisgah Forest, NC 28768
(704) 287-1563

magickentertain@gmail.com

Plaintiff, pro se

Date: February 23 , 2026

24

**CERTIFICATE OF SERVICE**

I hereby certify that on this __23__ day of February, 2026, I served a true and correct copy of the foregoing **OPPOSITION TO DEFENDANT NAVARR ENTERPRISES, INC.'S MOTION TO DISMISS**, together with all supporting exhibits, by depositing the same in the United States Mail, first-class postage, addressed to the following counsel of record:

**Counsel for Defendant Navarr Enterprises, Inc. d/b/a AudioSparx:**
David W. Sar, Esq.
dsar@brookspierce.com
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
230 North Elm Street Suite 2000
Greensboro, North Carolina 27401

**Counsel for Defendant Stability AI US Services Corporation:**
Susan H. Boyles, Esq.
SBOYLES@ktslaw.com
Kilpatrick Townsend & Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400

I also sent courtesy copies by electronic mail to counsel at the email addresses listed above.

This the __23__ day of February, 2026

**Jerry Anders**
Jerry Anders d/b/a Anders Manga
Plaintiff, pro se
132 Stoneridge Lane
Pisgah Forest, NC 28768
(704) 287-1563
magickentertain@gmail.com

## CERTIFICATION REGARDING ARTIFICIAL INTELLIGENCE

The undersigned hereby certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to the authority provided.

This the 23 day of February, 2026

Jerry Anders

Jerry Anders d/b/a Anders Manga
132 Stoneridge Lane
Pisgah Forest, NC 28768
(704) 287-1563
magickentertain@gmail.com
Plaintiff, pro se